1
2
3
4
5

6              **UNITED STATES DISTRICT COURT**

7                    **DISTRICT OF NEVADA**

8   ALLY FINANCIAL INC., a Delaware          )
    corporation,                              )
9                                             )          3:10-cv-00677-RCJ-VPC
                 Plaintiff,                    )
10                                            )
             v.                                )
11                                            )
    BOSCH MOTORS, INC., *et al.*,             )              **ORDER**
12                                            )
                 Defendant.                    )
13   _____ )

14

15          Currently before the Court is Plaintiff Ally Financial Inc.'s ("Ally") Motion for Summary

16   Judgment (#53).

17                         **BACKGROUND**

18          Bosch Motors, Inc. ("Bosch Motors") operated a new and used car dealership on the

19   property located at 1205 E. Winnemucca Blvd., Winnemucca, NV (the "Real Property") until

20   approximately April 2009.  (Bosch Decl. Ex. 1 ¶ 4(#57-1).)  In order to finance its new and

21   used vehicle inventory, Bosch Motors entered into a financing agreement with Ally, which

22   Herbert and Mary Lou Bosch guaranteed.  (Wholesale Security Agreement, Ex.2 (#57-1).)

23   The financing agreement was documented by a Wholesale Security Agreement ("WSA")

24   entered into on June 13, 1990, and thereafter amended several times.  (*Id.*)  Subsequent loan

25   agreements include Real Estate Loan Agreements, Deeds of Trust, Security Agreements, and

26   Promissory Notes (collectively, including the WSA, "Loan Agreements").  (*See, e.g.*, Exs. 3,

27   4, 5, 6 (#57-1).)  The Bosch family members also executed Guaranties for Bosch Motor's

28   performance under the various Loan Agreements.  (*See, e.g.*, Exs. 7, 8 (##57-2, 57-3).)

            The WSA provides that Bosch Motors will pay Ally on demand that amount that Ally

advances or is obligated to advance to the manufacturer or distribute for each vehicle acquired.  (WSA, Ex. 2 (#57-1).)  It provides that Bosch Motors will promptly remit payment to Ally for sums advanced by it to Bosch Motors on vehicles that Bosch Motors sells and leases as each vehicle is sold or leased and also provides for payment of interest on those vehicle loans at Ally's designated rate. (*Id.*)  Under the WSA, as collateral for the loans, Bosch Motors granted Ally a security interest in its inventory of then owned or after acquired new and used vehicles held for sale or lease, and all proceeds of such vehicles.  (*Id.*)  Bosch Motors agreed to pay Ally's legal fees and expenses incurred in exercising its rights and remedies. (*Id.*)  It further provides that in the event of repossession of the vehicles by Ally, the rights and remedies applicable under the Uniform Commercial Code ("UCC") shall apply.  (*Id.*)

On June 30, 2006, Bosch Motors entered into an Equipment Loan Promissory Note and Security Agreement in favor of Ally in the amount of $73,259.08 (the "Equipment Loan"). (Equipment Loan, Ex. 6 (#57-1).)  Pursuant to the Equipment Loan, Ally extended financing to Bosch Motors which enabled it to acquire two lifts, and air and lube systems (collectively, the "Equipment"). (*Id.*)  Under the Equipment Loan, Bosch Motors granted Ally a security interest in the Equipment and all proceeds. (*Id.*) The Equipment Loan included a cross-default provision by which a default under any other lending agreement between Ally and Bosch Motors is a default under the Equipment Loan.  (*Id.*)  Ally is permitted to repossess the Equipment upon default, and Bosch Motors is required to pay Ally's legal fees and expenses incurred thereunder.  (*Id.*)

On July 31, 2006, Ally loaned Bosch Motors the principal sum of $226,125.00 under a Working Capital Loan.  (Working Capital Loan, Ex. D (#49-4).)  In the event of a default, Ally is entitled to accelerate the loan balance and demand all unpaid amounts, and Bosch Motors is required to pay Ally's costs of collection, including attorney's fees and expenses.  (*Id.*)

Ally and Bosch Motors entered into four security agreements dated April 6, 1994, December 14, 2000, August 18, 2006, and May 22, 2008, respectively (collectively, the "General Security Agreements" or "GSA").  Under the April 6, 1994 General Security Agreement, Bosch Motors granted Ally a security interest in collateral, including but not limited

2

to all of Bosch Motor's vehicle inventory whether financed by Ally or not, Bosch Motors' parts inventory, its furniture, fixtures and equipment collateral (the "FF&E"), its accounts, and all cash and non-cash proceeds (collectively, the "Personal Property Collateral"). (April 6, 1994 GSA, Ex. E (#49-5).)   The General Security Agreement provides that in the event of repossession and sale of the Personal Property Collateral, Ally may apply the proceeds, less expenses, to the partial or complete satisfaction of any of Bosch Motor's indebtedness or obligation to Ally. (*Id.*)  Ally perfected its security interest in the Personal Property Collateral by filing a UCC-1 financing statement with the Office of the Secretary of State of Nevada. (Financing Statements, Ex. H (#49-8).)

On or about May 22, 2008, the Bosch Trust entered into a Commercial Real Estate Loan and Security Agreement under which Ally loaned the total principal amount of $1,580,363.22 to the Bosch Trust so that the Bosch Trust could refinance the existing loans against the Real Property ("Commercial Real Estate Loan"). (Commercial Real Estate Loan, Ex. I (##49-9, 49-10, 49-11).) The Commercial Real Estate Loan entitles Ally to non-judicially foreclose upon the Real Property in the event of a default.  (*Id.*)

Herbert Bosch, Mary Lou Bosch, Lee Bosch, and Susan Bosch (also known as Susan Rice) personally guaranteed Bosch Motors' obligations to Ally. (Guarantee Agreements, Ex. L (##49-14, 49-15, 49-16).)  All Defendants entered into one or more cross-default and cross-collateralization agreements with Ally (the "Cross-Default Agreements"). (Exs. M, N (##49-17, 49-18).)

Whenever Bosch Motors acquired new vehicles from a manufacturer or other dealers, Ally advanced funds directly to the manufacturer or other dealers on Bosch Motors' behalf, and each advance constitutes a loan from Ally to Bosch Motors under the WSA. (Wayne Aff. ¶ 41 (#49); WSA, Ex. B (#49-2).)  In order to obtain financing for used vehicles, Bosch Motors searched for, selected, and purchased used vehicles which met Ally's criteria for financing from auctions and other sources.  (Wayne Aff. ¶ 43 (#49).)

In addition to the interest due each month, Bosch Motors was obligated to pay the unpaid balance of any loan with respect to a vehicle promptly upon sale or lease of the vehicle.

3

1   (*Id.* ¶ 49)  Failure to comply with this obligation constituted a breach of the WSA, and a vehicle

2   that is sold without the outstanding balance paid off promptly after sale is referred to as being

3   "sold out of trust" or "SOT."  (*Id.*)  Ally conducted periodic audits to confirm that Bosch Motors

4   was complying with its loan repayment requirements.  (*Id.* ¶ 50.)  If Ally discovered a sold

5   vehicle for which loan repayment is due, Ally made demand for payment at the conclusion of

6   the audit, and if payment is not made, the vehicle was deemed SOT.  (*Id.*)  An SOT is a

7   breach of the WSA and causes the debt to become unsecured because the collateral is gone.

8   (*Id.* ¶ 51.)

9        On or about October 15, 2008, Bosch Motors defaulted under the WSA when payments

10  for seven vehicles totaling $253,040.09 which it had initiated to Ally via ACH (the Automated

11  Clearing House) transfer were subsequently, on or about October 20, 2008, returned for non-

12  payment by the Automated Clearing House because of insufficient funds.  (*Id.* ¶ 52.)  This

13  failure to pay Ally for a total of seven vehicles created an SOT condition.  (*Id.*)

14       Following the October 20, 2008 default, Ally's representatives conducted a collateral

15  audit and discovered that Bosch Motors was in default of the WSA because it had sold twenty-

16  eight vehicles and failed to pay Ally the proceeds of the sales of such vehicles.  (*Id.* ¶ 53.)  Ally

17  then exercised its right to declare all obligations due to it from Defendants due and payable

18  and to proceed with a non-judicial foreclosure sale of the Real Property.  (*Id.* ¶ 54.)

19       On October 23, 2008, Bosch Motors filed for bankruptcy protection under Chapter 11

20  of the United States Bankruptcy Code.  (*Id.* ¶ 55.)  On February 23, 2009, the Bankruptcy

21  Court ordered Bosch Motors, pursuant to a Stipulated Final Order ("Stipulated Order")

22  executed by both Bosch Motors and Ally, to take certain steps to dispose of Ally's new vehicles

23  and parts collateral and to repay Ally for the twenty-eight SOT vehicles.  (Stipulated Order, Ex.

24  R (#49-23).)  Bosch Motors was required, *inter alia*, to return new vehicles in its inventory that

25  were financed by Ally to GM for repurchase, return its inventory of parts, accessories and

26  special tools to GM, and to apply the proceeds to its debt due to Ally.  (*Id.*)  The Bankruptcy

27  Court also ordered that Bosch Motors deliver to Ally the used floored vehicles in its inventory

28  that were financed by Ally for sale.  (*Id.*)  Bosch Motors was also required to make monthly

payments of $15,000 to Ally.  (*Id.*)  In the event of a default, the Stipulated Order provided for Ally to seek a relief from stay order to foreclose on its collateral and pursue all of its rights and remedies under the agreements with Bosch Motors, and also provided that upon default, Ally could, without further notice, pursue all of its rights and remedies as to Bosch Motors' guarantors and non-debtor borrowers (the Bosch Trust).  (*Id.*)

Bosch Motors defaulted under the Stipulated Order by failing to make a payment due to Ally, and on April 6, 2009, an ex parte order terminating the bankruptcy automatic stay was entered, permitting Ally to foreclose on its collateral and pursue all of its rights and remedies. (Ex Parte Order, Ex. S (#49-24).)  Ally took possession of and transported all the new vehicle collateral to secure storage pending repurchase by GM, took possession of the used vehicle collateral and transported it to auction, and also assisted Bosch Motors in its parts return to GM.  (Wayne Aff. ¶ 62 (#49).)  The bankruptcy case was dismissed on June 4, 2010.

Ally disposed of the Personal Property Collateral by sale and applied the proceeds, less its costs and expenses, to the balance due from Defendants.  (*Id.* ¶ 63.)  Ally foreclosed on the Real Property on April 30, 2010 through a non-judicial foreclosure sale.  (*Id.* ¶ 65.)  The Real Property was sold at the Trustee's sale for $465,000.  (Trustee's Deed, Ex. X (#49-29).) After an appraisal finding that $490,000 was the fair market value ("fmv") of the Real Property, Ally credited $490,000 to the amounts due to it under the Commercial Real Estate Loan from Defendants. (Wayne Aff. ¶ 71-72 (#49).)

Ally sold eighty-one of the new vehicles back to GM for $2,733,908.98, which is only $987.18 less than the amount the vehicles were financed for by Ally.  (*Id.* ¶ 76.)  Twenty new vehicles did not qualify for repurchase because of excess mileage, model year, or other condition affecting eligibility for repurchase. (*Id.* ¶ 82.)  Nineteen of these vehicles were sold directly to other dealers via online or physical auctions.  (*Id.*)  The resulting shortfall from the sale of these nineteen new vehicles was $161,922.41 (*Id.*)  One of these twenty new vehicles was sold directly to a third party, resulting in no shortfall.  (*Id.* ¶ 78.)  Sixty-six used vehicles were sold directly to other dealers via online or physical auction, and the resulting shortfall was $44,633.02.  (*Id.* ¶ 79.)

5

Of $227,044.17 worth of parts submitted to GM fro return, parts worth $219,837.44 were accepted by GM. (*Id.* ¶ 80.) GM ultimately paid $206,293.29 for the parts, less than what it had agreed to pay due to the GM bankruptcy. (*Id.* ¶ 81.)

Ally did not sell the FF&E, allegedly due to age, condition, and remote location of the Bosch Motors dealership. (*Id.* ¶ 83.)

Ally incurred expenses totaling $86,651.27 in connection with the disposition of the collateral. (*Id.* ¶ 89.) Ally collected a total of $480,818.21 in proceeds and credited the proceeds to Bosch Motors' debt, along with the credit of $490,000.00 from the sale of the Real Property. (*Id.* ¶ ¶ 93, 94.) After applying all proceeds, Ally contends that Bosch Motors still owes $1,088,191.09 to Ally under the WSA, $244.20 in late charges under the Equipment Loan, $25,437.95 under the Working Capital Loan, and $1,065,662.33 under the Commercial Real Estate Loan as of May 31, 2012. Ally notes that it has ceased charging interest under the WSA since April 30, 2009, and ceased charging interest under the Equipment Loan and Working Capital Loan since November 19, 2009.

## LEGAL STANDARD

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. *N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171(1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although the parties may submit evidence in an inadmissible form — namely, depositions, admissions, interrogatory answers, and affidavits — only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  FED. R. CIV. P. 56(c); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.  *Anderson*, 477 U.S. at 248.  Summary judgment is not proper if material factual issues exist for trial.  *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999).  "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  Disputes over irrelevant or unnecessary facts should not be considered.  *Id.*  Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole.  *Id.*

**DISCUSSION**

Plaintiff seeks summary judgment on its claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment.  Defendants do not dispute that they breached loan agreements and guaranties with Plaintiff, they merely dispute the amount of money that is owed.  Specifically, Defendants dispute the fair market value of the Real Property on the date of foreclosure, and the value of other collateral Plaintiff credited to Defendants' debt.

1    While the parties did not discuss the issue, the Court notes that under Nevada law, "[a]n
2  action based on a theory of unjust enrichment is not available when there is an express,
3  written contract." *Leasepartners Corps. v. Robert L. Brooks Trust Dated November 12, 1975*,
4  942 P.2d 182, 187 (Nev. 1997). For that reason, the Court shall dismiss the claim for unjust
5  enrichment, as there are written contracts clearly setting forth the terms of the parties'
6  agreement, and Plaintiff has shown no facts supporting unjust enrichment separate from the
7  contracts.

8    Nevada law provides that "an implied covenant of good faith and fair dealing exists in
9  *all* contracts." *A.C. Shaw Constr. Inc. v. Washoe Cnty.*, 784 P.2d 9, 10 (Nev. 1989). The
10 covenant "essentially forbids arbitrary, unfair acts by one party that disadvantage the other."
11 *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000) (citations omitted). In some jurisdictions,
12 claims for breach of the covenant of good faith and fair dealing are dismissed as redundant
13 when the claim is based on the same allegations as a claim for breach of contract. *See, e.g.*,
14 *Serdarevic v. Centex Homes, LLC*, 760 F.Supp.2d 322, 334 (S.D.N.Y. 2010). Plaintiff has
15 failed to allege any facts supporting a claim for breach of the covenant of good faith and fair
16 dealing separate from the breach of contract claim. The evidence shows that Defendants
17 breached the express terms of their contract, and Plaintiff does not argue that Defendants
18 acted in any way that was arbitrary and unfair and contrary to the spirit of the contracts other
19 than by failing to make payments as required by the contracts.

20    There is no dispute, however, that Defendants are liable under breach of contract. The
21 only dispute is the amount of liability remaining. Plaintiffs applied a credit of $490,000 to
22 Defendants' debt after selling the Real Property. Defendants argue that the Real Property had
23 a higher fair market value as of the date of the trustee's sale. As an initial matter, Nevada law
24 provides that "[b]efore awarding a deficiency judgment under NRS 40.455, the court shall hold
25 a hearing and shall take evidence presented by either party concerning the fair market value
26 of the property sold as o the date of foreclosure sale or trustee's sale." NEV. REV. STAT. §
27 40.457. Therefore, Nevada law precludes the Court from establishing the Real Property's fair
28 market value through summary judgment. Furthermore, there is a large discrepancy between

the value of the Real Property as appraised by Plaintiff's experts and by Defendant's expert. For that reason, the Court shall deny granting summary judgment on the issue of the fair market value of the Real Property, and shall hold a hearing on the matter.

Defendants also argue that Plaintiff did not sell or otherwise dispose of the Personal Property Collateral or the vehicles at a reasonable market value. Defendants do not specifically dispute the manner in which Plaintiff sold Bosch Motors' new and used vehicle inventory, but argue that Plaintiff disposed of the vehicles for substantially less than the vehicles' wholesale value, and that Bosch Motors should have been credited with the full, fair value of the vehicle inventory, as valued in the Kelley Blue Book.

The Nevada UCC requires that the method, manner, time, place, and other terms of the disposition of collateral must be commercially reasonable. NEV. REV. STAT. § 104.9610. The disposition of collateral is made in a commercially reasonable manner if it is made "(a) [i]n the usual manner on any recognized market; (b) [a]t the price current in any recognized market at the time of the disposition; or (c) [o]therwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." NEV. REV. STAT. § 104.9627. "The fact that a greater amount could have been obtained by a [disposition] at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the [disposition] was made in a commercially reasonable manner." NEV. REV. STAT. § 104.9627. However, price obtained at sale is relevant as "a wide discrepancy between the sale price and the value of the collateral compels close scrutiny into the commercial reasonableness of the sale." *Iama Corp. v. Wham*, 669 P.2d 1076, 1079 (Nev. 1983).

Defendants argue that the Kelley Blue Book wholesale value of sixty-four of the vehicles that Plaintiff seized and sold was $283,724. (Kelley Blue Book, Ex. 10 (#57-4).) Defendants make no other arguments concerning the commercial reasonableness of Plaintiff's disposition of these vehicles. In their brief, Defendants repeatedly state that even if Plaintiff's disposition was commercially reasonable, a genuine issue of material fact remains because of the discrepancy between the sale price and the Kelley Blue Book value. However, in cases where

a discrepancy in price and value necessitated scrutiny into the commercial reasonableness of the disposition of collateral, courts focus on the manner of the sale that might have caused such a discrepancy–in *Levers v. Rio King Land & Inv. Co.*, the Nevada Supreme Court found that the secured party failed to provide reasonable notice to the debtor and took no steps to publicize the sale in any manner, and therefore the debtor was entitled to a credit equal to the fair market value rather than the sale price. *Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 920 (Nev. 1977).

Defendants have raised no genuine issues of material fact concerning the commercial reasonableness of the disposition of the vehicles besides the alleged discrepancy between sale price and value. Plaintiff gave notice of the disposition of the vehicles, and sold or returned certain vehicles to GM, sold other vehicles at dealer-only auctions or through direct sale.  Courts have found that dealers-only auctions may be commercially reasonable.  *See, e.g.*, *Beard v. Ford Motor Credit Co.*, 850 S.W.2d 23, 29 (Ark. Ct. App. 1993). The UCC provides that as long as the disposition is done in a commercially reasonable manner, which Defendants do not dispute, the fact that a higher price might have been obtained does not change the determination that the disposition was commercially reasonable. NEV. REV. STAT. § 104.9627.  For those reasons, we find that summary judgment is appropriate with respect to the amount of indebtedness remaining after Plaintiff credited Defendants for the vehicles.

Defendants also argue that they are entitled to credit for the FF&E collateral and for vehicle parts.  Plaintiff  did not dispose of the FF&E because of age, condition, and the remoteness of Bosch Motors' dealership location.  FF&E collateral consists of the furniture, fixtures, and equipment collateral from the Bosch Motors dealership.  Plaintiff submitted parts to GM for return, and most of the parts were accepted.  Defendants have submitted evidence showing that their expert appraiser valued the furniture at $23,000, parts thrown away at $160,314, and equipment at $204,000. Because there exists a genuine issue of material fact concerning the value of the parts and FF&E that were not credited to Defendants' indebtedness, the Court declines to grant summary judgment on this issue.

*///*

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that the Motion for Summary Judgment (#53) is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff is entitled to summary judgment on its breach of contract claim; however, Plaintiff's claims for breach of the covenant of good faith and fair dealing and for unjust enrichment shall be dismissed as redundant. Plaintiff is entitled to summary judgment with respect to the commercial reasonableness of its disposition of the vehicle inventory.  Summary judgment is denied on the issue of the fair market value of the Real Property and the commercial reasonableness of Plaintiff's disposition of the FF&E and parts collateral.  The exact value of the remaining indebtedness shall be determined at a deficiency hearing to be held by the Court.

Plaintiff's objections (#61) to evidence submitted in response to the Motion for Summary Judgment (#53) on the grounds of relevancy are **DENIED**.


DATED: This _29th_ day of March, 2013.


_____
United States District Judge